## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERCA** | : | **CRIMINAL NO. 13-206 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **AYAWNA Defendant,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S CONSOLIDATED MEMORANDUM IN AID
### OF SENTENCING AND MOTION FOR DOWNWARD DEPARTURE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The United States recommends that this Court Sentence the Defendant, Ayawna Webster, to one year of probation with 80 hours of community service as a condition of her probation.  In support thereof, the United States respectfully states the following.

### BACKGROUND

At a plea hearing on July 19, 2013, Defendant admitted to the following facts:

#### Individuals and Entities

1.    From in or around January 2007 until in or around December 2010, the Defendant, Ayawna Webster, a resident of the District of Columbia, served as Director of Constituent Services for D.C. Council Member Harry Thomas, Jr. ("Council Member Thomas"), the Ward Five elected representative to the Council of the District of Columbia ("D.C. Council" or "Council").  In or around January 2011, Council Member Thomas promoted Defendant to the position of Chief of Staff.

2.     Council Member Thomas was elected to the Council in November 2006 and took office in January 2007.  In his first four-year term in office, Council Member Thomas served as Chair of the Council's Committee on Libraries, Parks, Recreation and Planning, which involved oversight responsibility for the D.C. Department of Parks and Recreation ("DPR"), an agency that conducted youth sports activities, among other things.  Council Member Thomas's official duties as a Council Member included voting on legislation, such as laws concerning the distribution of public funds.  As part of Council Member Thomas's official duties, he, like other Council Members, advocated on behalf of individuals and organizations seeking funding and other support or assistance from the District of Columbia Government.

3.     Public-Private Partnership #1 was a non-profit, public-private partnership incorporated in June 1999 and dedicated to providing resources and developing programs that benefitted children and youth in the District of Columbia (the "District").  Public-Private Partnership #1 was primarily funded by the D.C. Government, including through funds designated by the Mayor or the Council, or both, for particular youth-related purposes.  Public-Private Partnership #1 provided grants to organizations to expand and improve services and opportunities for children and youth.  Public-Private Partnership #1 was a non-profit organization that had been granted tax-exempt status pursuant to Section 501(c)(3) of the Internal Revenue Code ("IRC").  As a 501(c)(3) organization, Public-Private Partnership #1 enjoyed tax benefits, including a tax exempt status, and qualified to receive tax-deductible contributions for income, estate and gift tax purposes.  However, the IRC prohibits a 501(c)(3) organization from engaging in some political activities, including contributing funds to political activities.

4.     From in or around July 2008 to in or around October 2009, Millicent West, formerly Millicent Williams, ("West") was the Director and Chief Executive Officer of Public-Private Partnership #1.

5.     During Council Member Thomas's first four-year term in office,  Neil Rodgers ("Rodgers") served as Committee Director for the Council Committee on Libraries, Parks, Recreation and Planning.

6.     Youth Technology Institute ("Youth Tech"), a non-profit organization that had been granted tax-exempt status pursuant to Section 501(c)(3) of the Internal Revenue Code, conducted youth programs and was controlled and operated by Danita Doleman ("Doleman"). Accordingly, the organization benefited by being exempt from some federal income taxes, but was prohibited from engaging in some activities, including contributing funds to political activities.

7.     Political Organization #1 was the District of Columbia's local chapter of a national, partisan political organization.  Defendant was the President of Political Organization #1.

8.     The Internal Revenue Service ("IRS") was an agency within the U.S. Department of Treasury responsible for administering and enforcing federal revenue laws and regulations.

**The Drug Prevention and Children at Risk Fund**

9.     The Public Fund for Drug Prevention and Children at Risk (the "Drug Prevention/Children at Risk Fund") was established by District law to raise money for programs that prevented drug and alcohol consumption and supported children under the age of 18 years who had direct or indirect contact with drugs.  The Drug Prevention/Children at Risk Fund was funded by District residents who voluntarily contributed money on their District of Columbia individual income tax returns, such as the Forms D-40 and D-40EZ.  This type of contribution

was known as a tax check-off fund.  By law, however, funds contributed to the Drug

Prevention/Children at Risk Fund had to be spent for fund's intended purpose.  District of

Columbia Code section 47-4002 required the Drug Prevention/Children at Risk Fund to be used

to support programs designed to prevent drug and alcohol consumption and to support persons

18 years old and younger who have had direct or indirect contact with drugs.

10.   Before approximately 2008, funds contributed to the Drug Prevention/Children at

Risk Fund were controlled and accumulating by DPR.  On or about May 13, 2008, the Council,

including Council Member Thomas, passed the Support for At-Risk Youth Act of 2008, which

transferred the administration of "all collected and future funds" to Public-Private Partnership

#1.

### The 51st State Inaugural Ball

11.   In or around December 2008, Council Member Thomas indicated publicly that an

inaugural event would be held at the John A. Wilson Building in the District of Columbia, and

that he would seek private donations to cover the difference between the event's cost and any

revenues raised by the $51 price of admission.  The event was called the 51st State Inaugural

Ball.

12.   Council Member Thomas sought to host the event, but was prohibited from doing so.

He then asked Defendant if Political Organization #1 would serve as the host for the 51st State

Inaugural Ball.  Defendant agreed that it would.

13.   From in or around December 2008 until in or around January 20, 2009, Defendant

organized the 51st State Inaugural Ball, including booking entertainment and contracting with

caterers, janitorial services, security services, and decoration providers.  Defendant signed the

contracts with the vendors that provided services for the 51st State Inaugural Ball.  Council Member Thomas was closely involved in planning the event.

14.   In or around December 2008, Defendant opened a bank account in the name of Political Organization #1 to deposit the funds collected from ticket sales for the 51st State Inaugural Ball.

15.   At no point during the planning and organization of the 51st State Inaugural Ball did Defendant consider the event as a "youth" event organized for the benefit of the D.C. residents under the age of 21, or of children that were at risk due to exposure to drugs and alcohol.  In organizing the 51st State Inaugural Ball, Defendant did not include any programs for youth, and/or drug prevention and alcohol awareness.

16.   The 51st State Inaugural Ball was held from 10 p.m. until approximately 2 a.m. in the Wilson Building on the evening of January 20, 2009, following the Inauguration of the President of the United States.

17.   The 51st State Inaugural Ball was an adult, formal, black-tie event, open to Members of the public who had purchased tickets.  Defendant tried to get a liquor license for the 51st State Inaugural Ball, but this request was denied because of the event's location at the Wilson Building.

18.   Before the 51st State Inaugural Ball occurred, Defendant knew that the ticket sales had not generated sufficient funds to pay for the event.  The funds from ticket sales before the Ball were largely used to pay the contract of one of the performers Defendant had booked to play at the Ball.  As a result, even before the Ball occurred, Defendant knew that she had very little money to pay the vendors for their services.

19.   As the day of the event approached, Defendant had conversations with Council Member Thomas about the lack of funding, but Council Member Thomas assured Defendant that she would get the funds to pay for the Ball.

### Efforts to Obtain Funding for the 51st State Inaugural Ball

20.   After the Ball, Chase was unable to pay the vendors that provided services for the 51st State Inaugural Ball.  On or about January 21, 2009, Defendant began receiving telephone calls and emails from the vendors that provided services for the 51st State Inaugural Ball demanding payment.

21.   Several days after the event, Defendant again spoke to Council Member Thomas about the funding problems.  Council Member Thomas told Rodgers that he would help obtain the funds to pay for the ball's expenses.  Council Member Thomas also directed Rodgers to speak with Millicent West to obtain funding to pay for the 51st State Inaugural Ball.

22.   As directed, Defendant spoke with Rodgers about the funding issues.  Rodgers initially declined to discuss the matter with Defendant, but later Rodgers asked Defendant for a list of vendors who supplied services for the ball and the amounts each vendor was owed. Defendant gave Rodgers this information.

23.   Rodgers also discussed a budget narrative attempting to portray the 51st State Inaugural Ball as a youth event.  Rodgers knew this narrative to be inaccurate, but did not care.

24.   On or about January 29, 2009, Rodgers submitted a budget and budget narrative to Public-Private Partnership #1 via email, seeking a $110,000 grant to Political Organization #1 to fund a "youth/young adult inauguration celebration."  This grant application paperwork was submitted to obtain funds to pay expenses associated with the 51st State Inaugural Ball. According to the proposed budget, the $110,000 would be used for "Other

consultants/professional fees."  The budget narrative stated that $10,200 of the grant funds would

be used for "Technical Assistance"; $30,000 would be for security, including 10 hours of "crowd

control"; $32,335 for a "Nutritional Component" consisting of "assorted and diverse regional

and cultural cuisine"; $10,000 for "Professional services" such as cleaning and trash removal;

$16,000 for "Marketing and Promotion"; and $11,465 for "Staffing," including "Project staff

responsible for creating concept, realizing outcomes and assuring compliance with plans."  In the

same email, Rodgers also inquired "how soon" a grant check could be issued.

25.   On or about February 2, 2009, Defendant was included on an email between

Rodgers and representatives at Public-Private Partnership #1 regarding a funding agreement.

Defendant was aware that Rodgers was attempting to obtain funding for the 51st State Inaugural

Ball from Public-Private Partnership #1.

## The Preparation and Submission of a False IRS Form W-9

26.   On or about February 3, 2009, an employee of Public-Private Partnership #1 emailed

Rodgers and requested that the prospective grantee, Political Organization #1, complete an IRS

Form W-9, Request for Taxpayer Identification Number and Certification, "Form," to enable

check processing.

27.   On or about February 3, 2009, Rodgers emailed the Form W-9 to Defendant, at her

private, non-government email account, and told her "[t]his needs to be completed, but we need

to discuss first."

28.   After receiving the email, Defendant went to Rodgers's office to discuss the Form

W-9.  Rodgers instructed Defendant to complete the form using Political Organization #1's

Employee Identification Number ("EIN") that was supplied by the IRS, but to falsely list the

name, "DC Young America," as the name of the entity, and to back-date the form to reflect the

date of January 4, 2009.  This date was approximately sixteen days before the Inaugural Ball was

held, and approximately thirty days before Defendant completed the form.

29.  Defendant completed the Form W-9 as Rodgers instructed.  Defendant listed the

name of the organization as "DC Young America," and listed the EIN that was assigned to

Political Organization #1.  Defendant also backdated the Form W-9 to January 4, 2009, before

the date of the 51st State Inaugural Ball.

30.  Part II of the Form W-9 states, in part, that:

> Under the penalty of perjury, I certify that:
>
> The number shown on this form is my correct taxpayer
> identification number (or I am waiting for a number to be issued to
> me) . . .

31.  After completing the Form W-9 falsely, as instructed by Rodgers, Defendant signed

her name to the Form W-9.

32.  Defendant read Part II of the Form W-9 and knew that she was signing the Form W-

9 under the penalty of perjury.  Defendant further knew that the name she provided on the Form

W-9 was a false name, and not the name of the entity to which the IRS had assigned the EIN

Defendant included on the FormW-9.  Defendant willfully signed the false Form W-9, and

provided the completed false Form W-9 with Rodgers, to be submitted to Public-Private

Partnership #1, under Defendant's name.

## Payment of the Expenses for the 51st State Inaugural Ball

33.  After completing the false Form W-9, Defendant continued to receive calls from

vendors requesting payment.  Defendant informed both Council Member Thomas and Rodgers

about these calls.  Council Member Thomas continued to tell Defendant that he was going to get

the funding to pay the vendors.

34.   On or about February 5, 2009, Council Member Thomas told Defendant that Doleman would be giving Defendant a check to pay for the expenses of the 51st State Inaugural Ball.  Defendant knew that Doleman operated a Youth Tech, and that she was a personal friend of Council Member Thomas.

35.   On or about February 5, 2009, Defendant found a check in the amount of $100,512 at her desk.  The check was signed by Doleman, but was a "starter" check that did not include address or other identifying information for the payor.  When Defendant attempted to cash the check on or about February 5, 2009, Political Organization #1's bank declined to do so because of the nature of the check.

36.   After she was unable to cash Doleman's check, Defendant called Council Member Thomas, who later informed Defendant that Doleman would be wiring the money to Defendant'S account.

37.   On or about February 6, 2009, Doleman wired approximately $104,500 to Political Organization #1's bank account, which was located in Virginia.  Defendant believed the funds she received from Doleman were the result of Rodgers's efforts to obtain public funding from Public-Private Partnership #1 to pay for the 51st State Inaugural Ball.

38.   Upon receiving the money from Youth Tech, Defendant obtained cashier's checks to pay some of the vendors that had provided services for the 51st State Inaugural Ball, including a check for $7,500 check payable to HLT Development to reimburse Council Member Thomas for his advance payment to secure entertainment for the event.  The total amount of money Defendant paid to vendors was less than the amount that Youth Tech transferred to Political Organization #1.

39.   In addition to paying vendors who provided services at the 51st State Inaugural Ball, Defendant obtained permission from Council Member Thomas to use some of the grant funds for expenses unrelated to the 51st State Inaugural Ball, including expenses Defendant incurred while traveling on behalf of Political Organization #1.

40.   Rodgers also directed Defendant to use the funds obtained to pay for the 51st State Inaugural Ball to pay another vendor that supplied services to an event Council Member Thomas sponsored.  This event was held well before the 51st State Inaugural Ball occurred, and was completely unrelated to the Ball.  Defendant wrote the check requested by Rodgers.

## Defendant'S Failure To Report Political Organization #1's Financial Activity

41.   On or about February 26, 2010, Defendant, in her capacity of the President of Political Organization #1, testified before the District of Columbia Office of Campaign Finance ("DCOCF"), at a hearing regarding Political Organization # 1's activities.

42.   The DCOCF "administers and enforces the District of Columbia laws pertaining to campaign finance operations, lobbying activities, conflict of interest matters, the ethical conduct of public officials, and constituent service and statehood fund programs."

43.   During her testimony, after having taken an oath to tell the truth, Defendant testified that during a time period that included January and February, 2009, Political Organization #1 did not have any financial activity.  Specifically, Defendant told the DCOCF that Political Organization # 1 did not have any funds deposited in its account, nor did it have any withdrawals from its accounts, during the months of January and February, 2009, when in fact, during that time period, Political Organization #1 had deposited $104,500 and withdrawn much of that money to pay the vendors.

44.   On or about October 20, 2011, Defendant, in her capacity as the President of Political Organization #1, filed with DCOCF a report of Political Organization #1's receipts and expenditures for the period of November 4, 2008 through October 20, 2011.  Although Political Organization #1 received $104,500 from Youth Tech during this period, Defendant falsely that reported Political Organization #1 had no financial activity for the period.  Defendant signed this seven-page document as the President of Political Organization #1, and attested to the document's accuracy.

45.   On or about February 3, 2009, in the District of Columbia, Defendant willfully made and subscribed a Form W-9, which was verified by Defendant's written declaration that it was made under the penalties of perjury, and at the time of this verification, Defendant did not believe that the Form W-9 was true and correct as to every material matter, in that the EIN listed on the Form W-9 did not belong to the name of the entity listed on the Form W-9.  As a result of her conduct, Defendant assisted in concealing the identity of the organization that was seeking funds to pay for the expenses of the 51st State Inaugural Ball.

## DEFENDANT'S LEVEL OF COOPERATION/ U.S. ATTORNEY'S OFFICE DEPARTURE COMMITTEE

Defendant testified before both the grand jury and at trial about her role in an effort to funnel to a political partisan organization funds set-aside for children and youth and to use these diverted funds to pay for an inaugural ball.  Defendant's testimony was crucial: for a number of the points about which she testified, there were no other witnesses who could have testified had Defendant not cooperated.  Her testimony was crucial in fleshing out certain aspects of the scheme to defraud.  She was fully cooperative, voluntarily meeting with the government to prepare for her testimony and providing truthful answers to our questions.  Throughout the time

she was cooperating, we are unaware of a single instance of Defendant intentionally providing any false or misleading information.

The Departure Committee found that Defendant provided substantial assistance in the investigation or prosecution of other persons.  The Departure Committee did not have to authorize a motion for a downward departure under U.S.S.G. §5K1.1 because, even prior to her cooperation, Defendant's applicable Guideline range was zero to six months.

## STATUTORY PENALTIES

Defendant faces a maximum sentence of 3 years of imprisonment; a fine of up to $250,000; a term of supervised release of up to one year; and a $100 special assessment.  PSR ¶¶ 109, 114, 124, 125 (citing relevant statutory sections).

## SENTENCING GUIDELINES

The Federal Sentencing Guidelines calculation in the Presentence Report places Defendant's total offense level at 8.  PSR ¶ 64.  The PSR calculates Defendant's criminal history in Category I (0 points).  PSR ¶ 67.  The Guideline range for Defendant is therefore zero to six months of imprisonment and one year of supervised release.  PSR ¶¶ 110, 115.

## SENTENCING RECOMMENDATION

The United States recommends that this Court sentence the Defendant, Ayawna Webster, to one year of probation with 80 hours of community service as a condition of her probation.

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted).  The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *id.* at 46, and are the "starting point and the initial benchmark," *id.* at 49.  The district court should next consider all of the

applicable factors set forth in Title 18, United States Code, Section 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 551 U.S. 338, 348-49 (2007).

The Section 3553(a) factors include (1) "the nature and circumstances of the offense and the history and characteristics of the Defendant," (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the Defendant, and to provide the Defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a).

The government's request for a sentence of probation, with 80 hours of community service, reflects the Government's recognition that the Defendant has no prior criminal history, she dedicated most of her career to public service, and she is unlikely to commit any further criminal acts. While Defendant's actions in this case significantly contributed to the success of the scheme, she took responsibility for her conduct, cooperated with the government, and, in so doing, attempted to make amends for her criminal conduct. Indeed, Defendant's cooperation with the Government significantly contributed to the success of the Government's case. Prior to trial, Defendant met with the Government on a number of occasions to aid the Government as it prepared the case. At trial, Defendant testified about her participation in the case and her testimony aided the jury in evaluating the evidence. As such, the Government believes Defendant should receive a substantial benefit for her cooperation. Accordingly, the United

States respectfully recommends that the Court sentence Defendant to one year of probation with

80 hours of community service as a condition of her probation.

Respectfully submitted,

VINCENT H. COHEN, JR.
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 471489


_____/s/_____
Michelle Zamarin, Esq.
DC Bar No. 474042
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C.  20530
202-252-6931
michelle.zamarin@usdoj.gov